**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Ken Green,

        Plaintiff,

v.

Pacifica Senior Living, LLC,

        Defendant.

No. CV-22-01601-PHX-DWL

**ORDER**

        Ken Green ("Plaintiff") alleges that he was terminated from his position as executive director of Pacifica Senior Living, LLC ("Defendant") for taking medical leave, in violation of the Family Medical Leave Act ("FMLA"), and for reporting suspected violations of Arizona law, in violation of the Arizona Employment Protection Act ("AEPA"). Defendant now moves to dismiss those claims under Rule 12(b)(6) or, alternatively, for a more definite statement under Rule 12(e). (Doc. 24.) For the following reasons, the motion is denied.

## BACKGROUND

I.   Factual Allegations

        The following facts, presumed true, are derived from Plaintiff's operative pleading, the Second Amended Complaint ("SAC"). (Doc. 22.)

        Plaintiff worked at Defendant's Scottsdale Village Square senior living center for over a decade. (*Id.* ¶¶ 12, 44.) He received a variety of pay raises between August 10, 2013 and January 31, 2021, never receiving a negative review during that period, and

eventually rose to the position of executive director.  (*Id.* ¶¶ 12-16.)

In July 2021, a storm damaged the Scottsdale Village Square location, resulting in leaks and flooding in parts of the building.  (*Id.* ¶¶ 17-18.)  Plaintiff concluded the storm damage created unsafe living and working conditions.  (*Id.*)  For example, some of the leaks were near electrical equipment.  (*Id.*)  And because of "damage to the facility, residents were kept in untenable conditions such as having their beds in the hallway for over ten days."  (*Id.* ¶ 30.)

On July 23, 2021, Plaintiff emailed two senior management employees and his direct supervisor to report his concerns.  (*Id.* ¶ 19.)  Plaintiff also supplied pictures to senior management showing that "the dining room was flooded, water was leaking from various locations in the roof which required a trash can to collect the water, and the ceiling and walls were becoming dilapidated due to water damage and neglect."  (*Id.*)

After Plaintiff's "initial attempts to remedy what he understood to be violations of Arizona state law were ignored," he "continued his attempts to remedy the unsafe conditions by complaining to Defendant's upper management officials, which was met with resistance and hostility."  (*Id.* ¶ 33.)  For example, on September 10, 2021, Plaintiff joined a conference call with senior management, including Defendant's owner.  (*Id.* ¶ 34.)  During the call, unspecified members of senior management "berated" Plaintiff for "allegedly not making enough money at the facility."  (*Id.* ¶ 35.)[1]

On September 14, 2021, senior management officials again "yell[ed] at and berate[d]" Plaintiff during a meeting "due to his repeated complaints to ensure a safe living space for the elderly residents at the facility."  (*Id.* ¶ 36.)  After this episode, Defendant's senior management "became distant" toward Plaintiff.  (*Id.* ¶ 37.)  Plaintiff's supervisor stated in a December 13, 2021 email that Plaintiff "makes everything so so so difficult"— a statement that Plaintiff attributes to his "numerous complaints about the . . . hazardous

---

[1]   The SAC further alleges that "[t]he discontent from [Defendant's] senior management team was based on [Plaintiff's] continued insistence that [Defendant] make legally required changes to bring the facility up to code."  (Doc. 22 ¶ 35.)  The SAC does not clarify whether Defendant's senior management officials made a statement to this effect during the September 10, 2021 conference call or whether this allegation simply represents Plaintiff's speculation as to those officials' true motivation.

living conditions." (*Id.* ¶¶ 38-39.)

From December 17, 2021 to approximately January 21, 2022, Plaintiff took FMLA leave with Defendant's permission. (*Id.* ¶¶ 40-41.) On January 24, 2022, Defendant informed Plaintiff that he "was to report to an entirely different facility, Pacifica Senior Living Paradise Valley." (*Id.* ¶¶ 43-44.) Although Defendant told Plaintiff he would serve as executive director at the Paradise Valley location, that location apparently already had an executive director. (*Id.* ¶ 46.) At the Paradise Valley location, Plaintiff was stationed in a "Med Room" that lacked a company phone or computer and for which he was not given a key. (*Id.* ¶¶ 49-51.)

On January 26, 2022, Defendant disciplined Plaintiff for not adhering to a 9:00 AM to 5:00 PM work schedule. (*Id.* ¶ 53.) Defendant did not previously tell Plaintiff that he was required to follow such a schedule, and Plaintiff did not follow such a schedule when working at the Scottsdale location. (*Id.*) That same day, Defendant also disciplined Plaintiff for failing to submit a daily report—a task he had not been required to perform in Scottsdale. (*Id.* ¶¶ 54-56.) This was the first time Plaintiff was ever disciplined by Defendant. (*Id.* ¶ 57.)

On January 28, 2022, Defendant terminated Plaintiff for "having an expired fingerprint clearance card." (*Id.* ¶ 58.) Plaintiff was never told before his termination that he should update his fingerprint card, and other employees working for Defendant had expired fingerprint cards but were not audited or terminated for it. (*Id.* ¶¶ 58, 61.) During Plaintiff's termination meeting, an unspecified management employee told Plaintiff "that she had to 'dig deep' in order to find a reason to terminate Plaintiff." (*Id.* ¶ 59.)

II.   Procedural History

On September 21, 2022, Plaintiff initiated this action. (Doc. 1.)

On January 5, 2023, Plaintiff filed the SAC. (Doc. 22.)

On January 19, 2023, Defendant filed the pending motion to dismiss or for a more definite statement. The motion is now fully briefed. (Docs. 25, 30.)[2]

---

[2]   Defendant's request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process. *See* LRCiv 7.2(f).

**DISCUSSION**

I.   <u>Legal Standard</u>

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

Rule 12(e) of the Federal Rules of Civil Procedure permits a party to request a more definite statement if a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Rule 12(e) motions "are viewed with disfavor and are rarely granted." *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal. 1994). "The purpose of Rule 12(e) is to provide relief from a pleading that is unintelligible, not one that is merely lacking detail." *U.S. E.E.O.C. v. Alia Corp.*, 842 F. Supp. 2d 1243, 1250 (E.D. Cal. 2012). *See generally* 1 Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12, at 353-54 (2022) ("Courts have construed Rule 12(e) narrowly and consider it a disfavored motion. Courts often state that it is limited to situations where the complaint is 'unintelligible.' This can occur for a variety of reasons, including, for example, where the allegations are so vague, convoluted, unstructured, or disorganized that the defendant cannot reasonably be expected to sort through them and grasp their meaning. Rule 12(e) is not to be used as a substitute for discovery or to force the plaintiff to

1    particularize its legal theories.").

2    II.    <u>Count One</u>

3          A.    **The Parties' Arguments**

4          In Count One, Plaintiff asserts an interference claim under the FMLA.  (Doc. 22

5    ¶¶ 63-72.)  More specifically, Plaintiff contends he was "terminated because he requested

6    and subsequently took a period of medical leave."  (*Id.* ¶ 69.)

7          Defendant moves to dismiss Count One on the ground that "Defendant could not

8    continue to employ Plaintiff as the administrator of its assisted living facilities due to

9    Plaintiff's failure to maintain an up-to-date fingerprint clearance card, as required by

10   Arizona law." (Doc. 24 at 5.)  According to Defendant, the statutory provision that creates

11   this termination requirement is A.R.S. § 36-446.01(A).  (*Id.*)

12         Plaintiff offers two arguments in response.  First, Plaintiff argues that "A.R.S. § 36-

13   446.01(A) does not warrant the dismissal of Plaintiffs FMLA . . . claim" because A.R.S.

14   § 36-411 was recently amended to remove the fingerprinting requirement for existing

15   employees, such that "according to the law that was in place at the time of [Plaintiff's]

16   termination, he had no requirement to meet the fingerprint and criminal check requirements

17   so long as he remained employed by [Defendant] and had previously met the fingerprint

18   requirements (which he did)." (Doc. 25 at 1-2.)  Second, and alternatively, Plaintiff argues

19   that the fingerprint-card rationale was pretextual and not the real reason for his termination.

20   (*Id.* at 2-3.)

21         In reply, Defendant argues that Plaintiff forfeited any argument as to the

22   inapplicability of A.R.S. § 36-446.01 by failing to "provide any analysis regarding" that

23   statutory provision in his opposition brief.  (Doc. 30 at 1-3.)  Defendant further argues that

24   Plaintiff's reliance on A.R.S. § 36-411 is misplaced because that provision only "applies

25   to rank and file employees of a nursing care institution whereas A.R.S. § 36-446.09(A)

26   . . . applies to Executive Directors such as Plaintiff."  (*Id.* at 3-6.)

27         …

28         …

1    B.    **Analysis**

2         Under the FMLA, an eligible employee "has a right to use a certain amount of leave

3    for protected reasons." *Bachelder v. Am. W. Airlines,* 259 F.3d 1112, 1122 (9th Cir. 2001).

4    An eligible employee also "has a right to return to his or her job or an equivalent job after

5    using protected leave." *Id.*   An employer may not "interfere with, restrain, or deny the

6    exercise of" these rights. *Id.* (quoting 29 U.S.C. § 2615(a)(1)).   *See also Sanders v.*

7    *Newport*, 657 F.3d 772, 777-78 (9th Cir. 2011) ("Under § 2615(a)(1), it is 'unlawful for

8    any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise'

9    the substantive rights guaranteed by FMLA.   When a party alleges a violation of

10   § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim.") (citations omitted).

11        "The appropriate legal framework for analyzing [an FMLA interference claim] is

12   not the *McDonnell Douglas* burden-shifting framework for employment discrimination

13   and retaliation claims, but a simpler standard derived from the applicable statute and

14   regulation." *Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 940-41 (D. Ariz. 2006).

15   "Plaintiff need only establish by a preponderance of the evidence that (1) he took FMLA-

16   protected leave, (2) he suffered an adverse employment action, and (3) the adverse action

17   was causally related to his FMLA leave." *Id.* at 941.   As for the third element, a plaintiff

18   "need only prove by a preponderance of the evidence that her taking of FMLA-protected

19   leave constituted a negative factor in the decision to terminate her.   She can prove this

20   claim, as one might any ordinary statutory claim, by using either direct or circumstantial

21   evidence, or both.   No scheme shifting the burden of production back and forth is required."

22   *Bachelder*, 259 F.3d at 1125 (citations omitted).

23        Applying these standards, Defendant has not established that Count One is subject

24   to dismissal under Rule 12(b)(6).   Defendant's arguments regarding the fingerprint-card

25   requirement (which Plaintiff has adequately opposed, thus undermining Defendant's claim

26   of forfeiture) are ultimately arguments about causation—that is, that Plaintiff's FMLA

27   leave could not have played any role in the termination decision because Defendant was

28   required under Arizona law to terminate Plaintiff's employment upon learning of his lapsed

1   fingerprint card.  But even assuming (as Defendant argues) that Plaintiff was required

2   under Arizona law to maintain an updated fingerprint card in order to maintain his license,[3]

3   it doesn't follow that Defendant was required to immediately fire Plaintiff upon learning

4   that Plaintiff's fingerprint card (and, thus, license) had expired.  The statutory provisions

5   cited by Defendant provide that a person who "manages" a nursing care institution or

6   assisted living facility without a valid license is guilty of a class two misdemeanor, *see*

7   A.R.S. § 36-446.09(A); that it is unlawful for such an unlicensed person "to practice or

8   offer to practice" skilled nursing facility administration or assisted living facility

9   management (or use titles, signs, cards, and devices indicating the same), *id.* § 36-

10  446.01(C); and that a facility that allows such an unlicensed person to serve as its

11  administrator may imperil its own license, *id.* § 36-446.01(A)-(B).  Those are serious

12  consequences, to be sure, but they say nothing about what an employer must do, from an

13  employment perspective, upon discovering that an administrator has a lapsed fingerprint

14  card.  Presumably, one alternative to termination would be for the employer to place the

15  administrator on leave until the oversight can be remedied.  In the interim, the administrator

16  would not be "manag[ing]" the facility or "practic[ing]" administration, which are the

17  categories of conduct prohibited by the relevant statutory provisions.  Nothing in those

18  provisions suggests that an employer must go further and immediately terminate any

19  administrator whose fingerprint card or license has lapsed.  This observation is consistent

20  with the SAC, which alleges that Plaintiff "was the only employee . . . terminated in relation

21  to a fingerprint card despite other employees having lapsed fingerprint cards."  (Doc. 22

22  ¶ 61.)

23  [3]      Under A.R.S. § 36-446.04(B) and (E), a person who is licensed or certified to serve
24  as a nursing care institution administrator or an assisted living facility manager "must
    maintain a valid fingerprint clearance card during the valid period of the person's" license
25  or certificate.  However, it is not clear that a violation of this requirement automatically
    results in the invalidation of a previously issued license or certificate.  Under A.R.S. § 36-
26  446.07(J), "[s]uspension, revocation or denial of renewal of a license or certificate . . . by
    the board becomes effective only on the board's first giving the licensee or certificate
27  holder prior written notice and affording the licensee or certificate holder the right to
    request a hearing within thirty-five days of the receipt of notice."  This provision suggests
28  that additional steps must be taken before the lapse of the fingerprint clearance card results
    in the revocation of a person's license or certificate.  However, the Court need not
    definitively resolve this issue at this stage of the case.

The bottom line is that a plaintiff asserting an FMLA interference claim "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." *Bachelder*, 259 F.3d at 1125. Here, the SAC alleges that there was close temporal proximity between Plaintiff's taking of FMLA leave and Defendant's termination decision, which "provides supporting evidence of a connection between the two events." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003). Additionally, the SAC alleges that one of Defendant's managers all but admitted that the fingerprint-card rationale for the termination decision was pretextual, by acknowledging during the termination meeting that "she had to 'dig deep' in order to find a reason to terminate Plaintiff." (Doc. 22 ¶ 59.) Nor has Defendant established that it was required under Arizona law to immediately terminate Plaintiff's employment upon learning of his expired fingerprint card. To the contrary, Defendant is alleged to have continued employing other employees who had expired fingerprint cards. Given this backdrop, Count One is not subject to dismissal at the pleading stage of the case—Plaintiff has pleaded facts that plausibly suggest that his FMLA leave was at least a negative factor in the decision to terminate him.

III.   Count Two

   A.   **The Parties' Arguments**

In Count Two, Plaintiff asserts an AEPA claim for retaliatory termination. (Doc. 22 ¶¶ 73-82.) More specifically, Plaintiff contends he was terminated in retaliation for his efforts to report to managerial or supervisory employees that he reasonably believed Defendant "was violating Arizona law in connection with its failures to maintain a safe and unhazardous nursing home and senior living facility." (*Id.* ¶ 77.) According to Plaintiff, the "Arizona law[s]" implicated by Defendant's conduct are A.R.S. § 36-132(A)(17), which authorizes the Arizona Department of Health Services ("ADHS") to "[l]icense and regulate health care institutions"; A.R.S. § 36-405, which requires the Director of ADHS to "establish minimum standards" for health care institutions; and various regulations promulgated by ADHS and codified in the Arizona Administrative Code, including

regulations that require a nursing care institution's premises to be "free from a condition that may cause a resident or an individual to suffer physical injury." (Doc. 22 ¶¶ 20-32.)

Defendant moves to dismiss Count Two on two grounds. (Doc. 24 at 4-12.) First, as with Count One, Defendant argues that Plaintiff cannot prove causation because it was legally obligated to terminate him upon learning of his expired fingerprint card. (*Id.* at 4-7.) Second, Defendant argues that Count Two should also be dismissed for the independent reason that "the complaint fails to identify any Arizona statute or [provision] of the Arizona Constitution underlying the claim." (*Id.* at 7.) More specifically, Defendant argues that Plaintiff's reliance on regulations appearing in the Arizona Administrative Code is misplaced because such provisions cannot provide the foundation for an AEPA claim. (*Id.* at 7-10.) As for the statutory provisions cited by Plaintiff, Defendant argues they merely vest ADHS with certain powers and duties or identify the penalties for certain statutory violations and do not establish that Defendant actually committed any such violations. (*Id.* at 11-12.)

In response, Plaintiff contends that the SAC "does not merely rest on Arizona's Administrative Code to support [the] wrongful termination claim" but "identifies regulatory violations that also constitute direct violations of specific state statutes." (Doc. 25 at 4-5.)

In reply, Defendant reiterates that Count Two fails because Plaintiff "has failed to cite to a single statute that can form the basis of his wrongful termination claim." (Doc. 30 at 6.) According to Defendant, "[i]nstead of pointing to a specific statute that he allegedly believed his employer or another employee had violated, Plaintiff's Response attempts to concoct a wrongful termination claim by mixing and matching unrelated regulations and statutes to make a far-fetched convoluted argument. Plaintiff's confusing Response proposes to link several regulations from the Arizona Administrative Code to various Arizona statutes in an attempt to confuse the Court into accepting that he has sufficiently identified an Arizona statute underlying his claim . . . . The regulations at issue were not created pursuant to the authority granted by the cited statutes." (*Id.* at 6-7.)

- 9 -

1

**B.    Analysis**

Defendant's first dismissal argument turns on the premise that Defendant was required by Arizona law to terminate Plaintiff's employment upon learning that Plaintiff's fingerprint card had expired.  But as discussed in Part II, Defendant has failed to substantiate that premise.  Accordingly, Defendant is not entitled to the dismissal of Count Two on this basis.

As for Defendant's other dismissal argument, the starting point for the analysis is the statutory text.  Under A.R.S. § 23-1501(A)(3)(c)(ii), "[a]n employee has a claim against an employer for termination of employment" if:

> The employer has terminated the employment relationship of an employee in retaliation for . . . [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

*Id.*  Thus, to prevail on a claim under this provision of AEPA (which gives rise to Plaintiff's claim in Count Two), Plaintiff "must establish: (1) [he] had information or a reasonable belief that [his] employer or another employee had violated an Arizona statute or constitutional provision; (2) [he] disclosed the information or belief to an employer or a representative of the employer whom [he] reasonably believed was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) [he] was terminated because of the first two steps."  *Denogean v. San Tan Behavioral Health Servs., LLC*, 2017 WL 4922035, *3 (D. Ariz. 2017).

Defendant only challenges the sufficiency of the SAC in relation to the first element, which, again, is that Plaintiff had "information or a reasonable belief that the employer, or

an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state."  A.R.S. § 23-1501(A)(3)(c)(ii).  As Defendant correctly notes, alleged regulatory violations do not, standing alone, suffice because regulations are not statutory or constitutional provisions.  *Chen v. Cozzoli LLC*, 2022 WL 5169236, *8 (D. Ariz. 2022).  However, where a regulation "is enforceable by statute and incorporates related statutes," it may provide the foundation for an AEPA claim.  *Seballos v. Freeport-McMoRan, Inc.*, 2023 WL 5624716, *5 (Ariz. Ct. App. 2023).  *See also Chen*, 2022 WL 5169236, *8 (regulatory violation may give rise to an AEPA claim where "the underlying statutory provisions . . . provide that a violation of the regulations is actionable or otherwise constitutes a violation of Arizona law"); *Ward v. Life Care Centers of Am., Inc.*, 2018 WL 5017004, *4 (D. Ariz. 2018) ("[B]ecause A.R.S. § 36-140 provides for the punishment of a violation of rules promulgated under the authority of A.R.S. § 36-132, and because the regulation at issue was promulgated by [ADHS] pursuant to that authority, Plaintiff has sufficiently identified a potential violation of a state statue as required under the AEPA.").

Here, Plaintiff alleges that he reasonably believed the leaks and flooding created unsafe living conditions at the Scottsdale location.  (Doc. 22 ¶¶ 18-19.)  Thus, Plaintiff has plausibly alleged that he reasonably believed Defendant violated A.A.C. R9-10-425(A)(1)(b), which requires the administrator of a nursing home to ensure that the "nursing care institution's premises and equipment are . . . [f]ree from a condition or situation that may cause a resident or an individual to suffer physical injury."

The parties' dispute centers on whether this is the sort of perceived regulatory violation that can provide the foundation for an AEPA claim.  The Court concludes that it is.  The regulation at issue, A.A.C. R9-10-425(A)(1)(b), was promulgated pursuant to statutory authority conferred by the Arizona legislature.  *See* A.R.S. § 36-132(17) ("The department, in addition to other powers and duties vested in it by law, shall . . . [l]icense and regulate health care institutions according to chapter 4 of this title."); A.R.S. § 36-405(A) (provision within chapter 4 that "[t]he director shall adopt rules to establish

minimum standards and requirements for constructing, modifying and licensing health care institutions necessary to ensure the public health, safety and welfare" and that "[t]he standards and requirements shall relate to the construction, equipment, sanitation, staffing for medical, nursing and personal care services, and recordkeeping pertaining to administering medical, nursing, behavioral health and personal care services, in accordance with generally accepted practices of health care"). Additionally, the Arizona legislature has, by statute, clarified that a violation of this regulation constitutes a violation of Arizona law. *See* A.R.S. § 36-140 ("A person who violates a provision of this article, *or a regulation adopted pursuant to this article*, is guilty of a class 3 misdemeanor for each violation.") (emphasis added).[4] Given this determination, it is unnecessary to decide, at least at this stage of the case, whether the other regulatory provisions cited by Plaintiff could also provide the foundation for an AEPA claim.

IV.   Request For More Definite Statement

   A.   **The Parties' Arguments**

Defendant argues in the alternative that "[i]f the Court is not inclined to dismiss Plaintiff's claims," the Court should "order Plaintiff to replead his claims so that [Defendant] may reasonably frame a responsive pleading." (Doc. 24 at 12.) Defendant argues that the SAC "does not provide sufficient notice of the nature and source of Plaintiff's alleged claims" because it "does not identify the specific Arizona statute(s) or constitutional provision(s) that would give rise to Plaintiff's wrongful termination claim." (*Id.* at 13.)

In response, Plaintiff contends that the SAC provides adequate notice to Defendant because it details the "unsafe living conditions" that "were the basis of" his complaints and

---

[4]      Defendant argues that A.R.S. § 36-140 is irrelevant because it "falls under Article 2, Chapter 1" of Title 36 and "Plaintiff fails to cite to a single provision of Article 2, Chapter 1 that allegedly forms the basis of his AEPA claim." (Doc. 30 at 7.) This argument is unavailing. A.R.S. § 36-132(17), which is also part of Article 2, Chapter 1, is the statutory provision that authorizes ADHS to "regulate health care institutions according to chapter 4 of this title." Thus, regulations such as A.A.C. R9-10-425(A)(1)(b) qualify as "regulations adopted pursuant to this article" for purposes of A.R.S. § 36-140. Indeed, the most recent amendment to Rule 9-10-425 identifies one of the "Authorizing statutes" as A.R.S. § 36-132(A)(1) and one of the "Implementing statutes" as A.R.S. § 36-132(A)(17). *See* Notice of Final Rulemaking, 25 A.A.R. 1583 ¶ 2 (June 28, 2019).

"clearly alleges" that they "amounted to several violations of [the] Arizona Administrative Code and Arizona statutes." (Doc. 25 at 6-7.) Plaintiff nonetheless "requests leave to amend to cure any deficiency identified by the Court" to the extent "the Court is inclined to grant Defendant's motion pursuant to 12(e) or 12(b)(6)." (*Id.* at 7.)

In reply, Defendant argues that "leave to amend . . . would be futile" because "Plaintiff believes his Complaint is adequately pled," Plaintiff previously refused Defendant's offer to allow him "to amend his Complaint," and Plaintiff "has already unsuccessfully amended his Complaint." (Doc. 30 at 8-9.)

B.      **Analysis**

The thrust of Defendant's Rule 12(e) request is that Plaintiff has failed to identify any statutes or constitutional provisions that can support his AEPA claim. This argument fails for the reasons set forth in Part III above. Defendant does not appear to challenge, for Rule 12(e) purposes, the adequacy of Plaintiff's FMLA claim.

Because the SAC is not so "unintelligible" that Defendant "cannot reasonably prepare a response," Defendant's alternative request for relief under Rule 12(e) lacks merit. *Alia Corp.*, 842 F. Supp.2d at 1250.

Accordingly,

**IT IS ORDERED** that Defendant's motion (Doc. 24) is **denied**.

Dated this 7th day of September, 2023.

Dominic W. Lanza
United States District Judge